McCOY (CRANE v.). See Case No. 3,354.

## Case No. 8,730.

### McCOY et al. v. The CURRITUCK et al.

[2 Hughes, 91.] [1]

District Court, E. D. Virginia. Feb. 25, 1875.

COLLISION — RULE ON ENTERING CHANNEL.—CUSTOM ON CHESAPEAKE AND ALBEMARLE.

1. The statutory rule that "when two boats are about to enter a narrow channel at the same time, the ascending boat shall be stopped below such channel until the descending boat shall have passed through it," though valid as a statutory rule only on Western rivers, may be valid also on Eastern waters by custom and usage.

2. *Held.* that this being a customary rule on the waters of the Chesapeake and Albemarle navigation, a vessel was in fault for disregarding it, and was responsible for the damage of a collision resulting from her action.

[This was a libel by Charles McCoy and others, owners of the schooner Pennsylvania, against the owners of the steamer Currituck.]

The case is that of a collision between the barge Dispatch, in tow of the Currituck, and the schooner Pennsylvania, in tow of the Molyneux. On the 12th October, 1874, the Dispatch ran into the Pennsylvania and sunk her, at the east end of the Dutch Gap Cut, on the Elizabeth river, a few miles from Norfolk. The Elizabeth river makes a bend west, and one east, of the cut called the "Dutch Gap," on each side, about 250 yards from the cut. There is a buoy about 70 yards east of the cut. The cut itself is about 110 yards long, about 65 feet wide on the surface of the water, and seven to nine feet deep. The distances are derived from the diagram of the Gap and the waters approaching it, which was prepared by a United States engineer, and is filed in the papers. On the morning of October 12th, 1874, at about nine o'clock, as the steam-tug Molyneux (16 tons), towing the schooner Pennsylvania (both light), moving with the tide and wind, from the west towards the cut, turned the bend, she saw the steamer Currituck (93 tons), having in tow the barge Dispatch, turning the bend on the east of and moving towards the cut. The usual signal of vessels about to meet was given, which was one whistle, meaning, keep to the right. The signal was promptly answered by the

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. Robert W. Hughes. District Judge, and here reprinted by permission.]

Currituck. The tow-line of the Pennsylvania was forty fathoms long, that of the Dispatch ten fathoms. The statement of Captain Phillips, master of the Currituck, that the Pennsylvania's tow-line was seventy-five fathoms, is contradicted, and is, besides, incredible. Tall vessels moving in open waters may use a hawser of that length, but a small steam-tug drawing a schooner could not keep it out of water, or move with it at all, in bending, narrow channels.

W. H. C. Ellis, for libellants.
Baker & Walke, for respondents.

HUGHES, District Judge. From a comparison of all the evidence, I conclude the facts of the case, concerning the meeting of these approaching vessels and the collision that occurred, to be as follows: Both of the steamers slowed down their engines, but both kept on in their courses. The Molyneux, which was moving with the tide and the wind, entered the cut first, passed through it, and had passed out of it, as the Currituck was about to enter it on the east end. Captain Phillips says the Molyneux passed him between the end of the cut and the buoy. The Currituck, still moving on, had got her bow about twenty feet into the mouth of the cut, when the Pennsylvania met her in coming out of it. The Pennsylvania being 17½ feet wide, and the Currituck the same width, there was but little space to spare for the passage of each other, and, the channel being narrow, the port stern quarter of the Pennsylvania struck heavily some projecting lumber on the Currituck. This collision probably rendered the Pennsylvania more or less unmanageable by her helm as she went out of the cut, and, after passing out, she was struck in her port bow by the Dispatch, and sunk in half an hour. The hawser of the Dispatch was slack when she ran into the Pennsylvania. As the Currituck had just moved on from where she passed the Molyneux to a point twenty feet in the cut and stopped, I infer that it was the headway of the Dispatch which had slackened her hawser at the time of her running into the Pennsylvania. The evidence of the men on the Molyneux and Pennsylvania is, that the current caught the Dispatch after turning the buoy, and threw her across against the Pennsylvania. I think this must have been true to some extent. The owners of the Pennsylvania now libel the owners of the Currituck and Dispatch for the damage they have sustained from this collision, amounting to about $600.

There can be no denial of the fact that the Molyneux and her tow moved on after discovering the approach of the Currituck and her tow; that the Molyneux had just passed through the cut when she met the Currituck; that she was moving with tide and wind, while the Currituck was moving against both; and that, by the aid of tide and wind, she had made only about the length of the cut more distance than the Currituck had made, when they passed each other, although the Currituck had been moving against tide and wind. All the evidence seems to concur in stating that when the steamers first saw each other they were about equally distant from the cut. The inference, therefore, is irresistible, whatever may be the conflicting statements of witnesses, that the Currituck did keep moving on after answering the signal of the Molyneux. There can be no reasonable doubt that the master of the Currituck, Captain Phillips, acted on the idea which he insisted upon in his evidence—that he was not bound to stop his vessel, that it was practicable for vessels to pass each other in this cut, that he had frequently done so, and that there would have been no collision in the cut if the Pennsylvania had kept to the right.

I conceive that there is but one question in the case, and that is: whether the Currituck, running in this narrow stream, against wind and tide, and therefore more manageable, was not bound to stop on discovering the Molyneux and her tow meeting her, she being driven on by wind and tide, obliged to keep out of the way of her tow, and thus comparatively unmanageable? Was not the Currituck bound to stop east of the buoy, as Mr. Marshall Parks thinks, until the Molyneux and her tow had passed through the cut?

There are very few cases of collision in which there is on either side intentional fault or malfeasance. They are generally the result of negligence, surprise, ignorance of duty, misjudgment, or mistake. In ascertaining who is liable for a collision, the courts do not seek for bad motives in the persons connected with the accident, but apply certain rules of navigation to ascertain who has been at fault in not strictly complying with those rules. The parties to the accident are generally unanimous on each side in ascribing the blame to the other. They are generally sincere in doing so, neither party having intended the injury. The courts are therefore obliged very much to disregard the conflicting testimony of the witnesses on either side as to motive, negligence, and blame; and to consider the testimony chiefly with reference to those rules of navigation which usually supply an unfailing test as to where the fault has been, that fault being generally unintentional, and legal fault rather than moral.

The only question in the present case, I conceive, is whether the Currituck was not bound to stop until the Molyneux had passed out of the cut. She did not stop after being signalled by the Molyneux. She kept on. She made nearly as much distance against tide as the Molyneux made with tide. She persisted in entering the narrow canal before the Pennsylvania had passed out of it, although the captain charges that the

schooner was badly managed with too long a hawser. There can be no doubt that, by putting the Currituck twenty feet into the cut and thereby bringing the Dispatch up within thirty yards of her stern, the collision of the Pennsylvania, first with the Currituck and then with the Dispatch, was caused.

There is no statutory rule of navigation prescribed for vessels meeting each other in narrow channels and streams, except upon the waters of the Western rivers of the United States. Under the act of congress of February 28th, 1871 [16 Stat. 440], and the action of the supervising inspectors taken in pursuance of that act on the 12th of June, 1871, a rule was made statutory which had long before been a custom of those rivers in the navigation of steamboats. That rule is in these words: "When two boats are about to enter a narrow channel at the same time, the ascending boat shall be stopped below such channel until the descending boat shall have passed through it," etc., etc. Although this rule did not attain to the form of a statutory enactment until 1871, it had for many years before been the law of navigation on our Western rivers by the custom of navigators. A similar rule had frequently been recognized and enforced by the supreme court of the United States; as, for instance, see Williamson v. Barrett, 13 How. [54 U. S.] 101; and Goslee v. Shute, 18 How. [59 U. S.] 463. See, also, The America [Case No. 280], where the admiralty court enforced a rule of this class which had been enacted for the navigation of the Hudson river by the legislature of New York. If, thererore, there was a rule of navigation recognized by those who were running boats on the Elizabeth river and the line of navigation of which it is part, similar to the one which has been made a statutory provision as to our Western waters, then the Currituck was bound to observe that rule. The masters of the Molyneux and Pennsylvania and other witnesses for the libellants testify to the existence of such a rule. Marshall Parks, Esq., president of the Albemarle and Chesapeake Navigation, whose authority I accept as conclusive on the subject, testifies to the existence and universal recognition of this rule. In fact. it is a rule of navigation for those waters. The Molyneux did not violate, but observed it. It is not pretended that she departed from the rule; and "a very clear case of departure from a rule of navigation must be made out before a vessel can be pronounced in fault for adhering to it." See The Clement [Id. 2,879]. This collision happened from fault somewhere. If the Currituck had observed the rule of navigation requiring the vessel moving against the current to stop, in approaching a narrow channel, until a vessel meeting her passes through

it, this collision could not have happened. She was in fault in not stopping; is therefore responsible for the accident; and I must accordingly decree against her.

NOTE. I have treated the rule of navigation referred to as a single general rule. In respect to this particular channel, called the "Dutch Gap Cut," the evidence in the case proves the existence, not only of the general rule, but also a special rule observed by vessels, not to meet in this cut.